# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### October 7, 2003 Session

## STATE OF TENNESSEE v. YDALE BANKS

**Appeal from the Criminal Court for Shelby County**
**No. 96-06381-88     Joseph B. Brown, Jr., Judge**

---

**No. W2000-00963-CCA-R3-CD  - Filed July 28, 2004**

---

A Shelby County Criminal Court jury convicted the defendant, Ydale Banks, of first-degree felony murder, first-degree premeditated murder, conspiracies to commit both modes of first-degree murder, especially aggravated burglary, especially aggravated robbery, three counts of especially aggravated kidnapping, and three counts of aggravated assault. The defendant now claims on appeal that:

(1)     the trial court erred in denying the defendant's motion to suppress his pretrial statement;

(2)     the trial court erred in refusing to grant the defendant's motion for a judgment of acquittal;

(3)     the evidence presented at trial is insufficient to support the convictions for first-degree murder;

(4)     the trial court erred in admitting prejudicial photographs into evidence in the sentencing phase of trial;

(5)     the trial court erred in admitting victim-impact evidence during the sentence phase;

(6)     the provisions of Tennessee Code Annotated section 39-13-204(c) relative to the use of victim-impact evidence are unconstitutional;

(7)     the trial court erred in instructing the jury; and

(8)     the trial court erred in instructing the jury as to the definition of "knowingly."

We reverse the judgment of conviction of conspiracy to commit felony murder but otherwise affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court are Affirmed in Part, Reversed in Part, and Remanded.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Michael E. Scholl, Memphis, Tennessee, for the Appellant, Ydale Banks.

Paul G. Summers, Attorney General & Reporter; Thomas E. Williams, III, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Goodman and Tom Hoover, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

The convictions now under review emanated from events of August 12, 1995, which resulted in the death of Dorothy Webber, a 47-year-old nurse and beauty shop operator. The victim resided with her husband, Leslie B. Webber, Sr., and on the night of August 12, 1995, her son, Leslie B. Webber, Jr., was staying at her residence.

The victim's son testified that, on that night, he awakened to discover a female standing in the hallway. She held a revolver and told the younger Webber that he was "supposed to be asleep." A male intruder then entered the room, held a pistol to the younger Webber's head, and tied his hands with a vacuum cleaner cord. The intruders wore beige pants, white shirts, and white caps. The shirts and caps bore "Krispy Kreme Doughnut" logos. The younger Mr. Webber heard the voice of a third intruder, a male.

At one point, a male intruder placed a pillow over Mr. Webber's head, and Mr. Webber heard someone ransacking his room. He testified that the intruders asked where the money was, and Mr. Webber replied there was no money in the house. Mr. Webber heard the intruders addressing the elder Mr. Webber in the family den and telling him that the intruders were taking his wife, the victim, with them. When the younger Mr. Webber untied himself and went into the den, the intruders were gone, and he found his father handcuffed, dazed, and with a knot on his head. Both the victim and the victim's car, a Toyota Camry, were gone. The younger Mr. Webber testified that the intruders had entered the house by posing as Krispy Kreme employees selling or giving away doughnuts. A box of doughnuts was left behind in the den.

Approximately ten days later, the victim's body was found in a field in a rural area in Mississippi. Her hands had been cuffed behind her back, and duct tape had been wrapped around her head. The medical examiner testified that the victim had died between August 13 and 16; she had suffocated as a result of the tape across her mouth and nose.

Several weeks after the body was discovered, Memphis Police Officers interviewed the defendant about the home invasion and the death of the victim. In the resulting statement, the defendant admitted that he had been involved in the planning of a robbery or kidnapping. Three other men, a woman, and the defendant believed that a second son of the Webbers, Kevin Webber, was a drug dealer who had amassed $300,000 in cash. The cabal of five decided three of them would gain entry to the Webber house by posing as Krispy Kreme employees. They purchased white shirts and caps and arranged to have Krispy Kreme logos affixed. The group talked about kidnapping the victim as a means of extracting a $300,000 ransom payment from Kevin Webber, should the money not be found in the elder Webbers' house. The defendant waited in a vehicle while three of his associates entered the house. After about fifteen minutes, the intruders emerged

-2-

from the Webbers' garage in the victim's Camry; the victim was in the backseat. In his statement, the defendant stated that the group took the victim to a room in the Elvis Presley Inn. Later, they took her to a tire shop to which they had access; they kept her there throughout the night. On the following morning, they placed the victim inside a U-Haul truck, and the defendant drove the truck into Mississippi, where he backed it into a field. According to the defendant's statement, two of the other men removed the still-conscious victim from the truck and left her in the field. The victim was not "supposed to die."

Following guilty verdicts on the various charged offenses and faced with the state's quest for the death penalty, the lower court conducted a jury hearing on the issue of penalty on the murder convictions. The victim's mother testified that the loss of her daughter "meant everything to [her] because [she did not] have her any more, and . . . [would not] see her anymore." She testified that the victim was "the love of the family and everybody loved her." Following this testimony, the state introduced photographs of the victim's body taken at the scene and in the morgue.

The defendant's sisters testified in his behalf. One testified that the defendant is a "valuable asset to [his] family" and is loved by them. She testified that the defendant had a six-year-old daughter, with whom he maintained a close relationship despite his incarceration. The other sister affirmed the family's affection for the defendant and testified that the defendant had always held a job and did so until he was incarcerated. She testified that he was skilled as a cook.

The mother of the defendant's daughter testified that the defendant worked very hard and aspired to be a chef. She testified that the defendant had a strong bond with his daughter and provided well for her financially. Despite the defendant's incarceration, he remained close to his daughter.

I. Suppression of the Defendant's Statement.

In his first appellate issue, the defendant claims that the trial court erred in denying his pretrial motion to suppress his inculpatory statement. The record reflects that the trial court held an evidentiary hearing on the defendant's motion to suppress the statement. In the hearing, Memphis Police Lieutenant, then-Sergeant Dwight Eldridge Woods testified that on October 26, 1995, he along with then-Sergeant Martz interviewed the defendant at the police station in connection with his investigation of the death of the victim. He testified that Sergeant Martz read the *Miranda* rights to the defendant, and at 4:25 p.m., the defendant signed the waiver of rights form, indicating that he understood his rights and desired to waive them. *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

The interview began shortly after the defendant signed the waiver form. During the initial part of the interview, the defendant "denied any knowledge of what happened." During a break when Sergeant Martz had left the interview room about 7:30 p.m., the defendant asked Sergeant Woods what he should do, and Woods told the defendant that he should tell what he knew about the victim's death. Woods testified that the defendant was cooperative and gave the officers

no problems. The defendant asked Sergeant Woods whether Woods could help him, and Woods testified that he told the defendant, "Well, I'm not in charge of the case[, and] I can't help you.... [T]he homicide people [], if you cooperate they may let the [j]udge, or prosecutors know that you cooperated . . . ." Sergeant Woods denied promising anything to the defendant or threatening him. He acknowledged that, during the interview, the defendant asked him to hold the defendant's hands, which Sergeant Woods did. The defendant cried and said that he "knew about what happened and that he would tell us."

After Martz returned to the room, the interview resumed, and ultimately, the 22-year-old, twelfth-grade-educated defendant gave a formal, transcribed statement. When presented with the transcript and asked to review it to make any needed changes, the defendant suggested no changes. He initialed the first five pages of the statement and signed the sixth and final page at 11:15 p.m.

Sergeant Woods testified that throughout the interview process, the defendant seemed to understand the process and never seemed confused or asked to stop the interview.

On cross-examination, Sergeant Woods testified that, to the best of his understanding, the defendant had been arrested and brought to the police station on October 26, 1995. He was in custody at the time the interview commenced. During the interview, the defendant's hands were free, but his leg was cuffed to his chair. Woods denied discussing the issue of penalty with the defendant and specifically denied mentioning the death penalty to the defendant. Woods testified that he told the defendant that if he cooperated, the officers "may tell the attorney general that he cooperated." Woods testified that the defendant never asked for an attorney.

The defendant testified in support of his suppression motion that when he was picked up by the police at a bowling alley, he was told that he was being charged with criminal attempt, based upon his voice being on tape with regard to some robberies. Later, Woods told him that if he told them anything about the victim's death, Woods "can see about getting the . . . criminal attempt felony charges dropped." The defendant testified that Woods told him that the defendant could get the death penalty in the Webber case and that "nine times out of ten if [the accused gives] a statement, then, that would probably show a whole lot of leniency . . . [and] probably wouldn't get a whole lot of time out of it." The defendant further testified that Woods claimed to have talked to the defendant's mother and that she had expressed a desire for the Webber case to be resolved. He testified that Woods threatened that unless the defendant revealed his knowledge about the case, Woods could charge the defendant's sister and have her fired from her job. The defendant testified that despite his informing Woods that he was recovering from a gunshot wound to his left hand, his left hand was cuffed to the chair during the interview on October 26, 1995. He testified that he was scared and asked to contact Attorney Kathryn Swisher. He stated that the officers told him that Ms. Swisher was at home in bed and would not come down to help him.

Although the record on appeal contains no clear indication of the trial judge's specific ruling on the motion to suppress, the admission of the defendant's pretrial statement into evidence at trial indicates that the suppression motion was denied.

On appeal, the defendant claims the trial court should have suppressed his pretrial statement because his will to exercise his right to refrain from confessing was overborne by the officers and because the officers prevented the defendant from exercising his right to counsel. The state argues that the evidence of record supports the lower court's determination that the confession was freely and voluntarily rendered, as well as its implicit determination that the defendant made no request for counsel.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Our supreme court has previously held that "[t]he significant difference between these two provisions is that the test of voluntariness for confessions under Article 1, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Crump*, 834 S.W.2d 265 (Tenn. 1992).

To admit a defendant's statement into evidence, the statement must have been given voluntarily by a defendant knowledgeable of his constitutional rights and accompanied by a valid and knowing waiver of those rights. *See State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). The prosecution may not use statements, whether inculpatory or exculpatory, that stem from custodial interrogation unless it demonstrates the use of procedural safeguards that effectively secure the privilege against self-incrimination. *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612; *Crump*, 834 S.W.2d at 268; *State v. Hicks*, 629 S.W.2d 908, 910 (Tenn. Crim. App. 1981) (defendant's statement given three hours after *Miranda* warnings held to be admissible).

Before a defendant can knowingly and voluntarily waive his *Miranda* rights, the defendant must be "adequately and effectively apprised of his rights." *Middlebrooks*, 840 S.W.2d at 326. If the waiver is made "voluntarily, knowingly and intelligently," a defendant may waive his rights. *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. The state has the burden of proving the waiver by a preponderance of the evidence at the hearing on the motion to suppress. *State v. Bush*, 942 S.W.2d 489, 500 (Tenn. 1997). In determining whether a defendant has validly waived his *Miranda* rights, courts look to the totality of the circumstances. *Middlebrooks*, 840 S.W.2d at 326.

Furthermore, a confession must be free and voluntary, and it must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence or other evidence of police overreaching. *Bram v. United States*, 168 U.S. 532, 18 S. Ct. 183 (1897). The issue of voluntariness requires the trial judge to focus on whether the accused's will to resist making a confession was overborne. *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980).

When a defendant claims that his statement was compelled by coercive police tactics such as promises of leniency, the pertinent inquiry is not merely whether the statement was made only as a result of such promise. *Kelly*, 603 S.W.2d at 729. Rather, it is "whether the accused was so gripped by the hope of leniency that he did not or could not freely and rationally choose among the available courses of action." *Id.* (quoting *Hunter v. Swenson*, 372 F. Supp. 287, 300-01 (W.D. Mo. 1974)); *see State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996).

Special rules attend the admission of a defendant's pretrial statement when the statement was preceded by the defendant's request for the assistance of counsel. Generally, the defendant is entitled to suppression of his statement if he unequivocally requested counsel and that request was not honored. *See State v, Saylor,* 117 S.W.3d 239, 244 (Tenn. 2003). Whether an accused requested the assistance of counsel or whether a request was equivocal is a question of fact to be resolved by the trial court. *Id.*; *State v. Harbison,* 704 S.W.2d 314, 318 (Tenn. 1986).

When reviewing a trial court's findings of fact and conclusions of law on a motion to suppress evidence, we are guided by the standard of review set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23. However, when the trial court does not set forth its findings of fact upon the record of the proceedings, the appellate court must decide where the preponderance of the evidence lies. *Fields v. State*, 40 S.W.3d 450, 457 n.5 (Tenn. 2001); *see also Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997). As in all cases on appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *See State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Furthermore, we review the trial court's conclusions of law under a *de novo* standard without according any presumption of correctness to those conclusions. *See, e.g., State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). Last, we are mindful that in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider proof adduced both at the suppression hearing and at trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

In the present case, the trial court made no findings on the record concerning the suppression issues, and therefore, we must determine where the preponderance of the evidence lies. *See Fields*, 40 S.W.3d at 457 n.5. That notwithstanding, the state, as the prevailing party below, benefits from the strongest legitimate view of the evidence, as well as all reasonable inferences that may be drawn therefrom. *Carter*, 16 S.W.3d at 765. Indulging the state this benefit, the record supports the denial of the motion to suppress. Lieutenant, then-Sergeant Woods detailed an orderly process in which the officers advised the defendant of his *Miranda* rights, procured a written waiver of his rights, obtained an informal statement, and procured the defendant's adoption of a formal transcript of the statement. The officer's testimony that the defendant waived his *Miranda* rights was not factually challenged. Thus, the state carried its burden of demonstrating that the high-school-educated defendant voluntarily and understandingly waived his rights. Furthermore, the officer affirmatively contradicted the defendant's claim that his will to remain silent had been overborne

by promises of leniency, physical discomfort, and threats that the defendant's sister would lose her job unless the defendant confessed. Indulging the state as the prevailing party below the strongest legitimate view of the evidence, the defendant's left hand was not handcuffed during the interview, and he was not told that his sister would lose her job lest he confessed. Moreover, the officer did not discuss punishment with the defendant, nor did the defendant request the assistance of counsel during the interview process. In short, the record supports the trial court's determination that no constitutional issues prevented the admission of the defendant's pretrial statement.

## II. Sufficiency of the Evidence.

Next, we address two of the defendant's issues in combination. In the first, he claims that the trial court erred in not granting a judgment of acquittal on the charge of premeditated first-degree murder, and secondly, he claims that the evidence insufficiently supports the convictions of both premeditated and felony murder.

Both issues effectively require the same legal analysis. Tennessee Criminal Procedure Rule 29(a) confers upon the trial court the authority to enter a judgment of acquittal, either at the time the state rests or at the conclusion of all the evidence, when the evidence is insufficient to justify a conviction. Tenn. R. Crim. P. 29(a). When such a Rule 29(a) motion is made, the trial court is required to favor the state with the strongest legitimate view of the evidence, which includes all reasonable inferences drawn therefrom, and to discard any countervailing evidence. *See State v. Price*, 46 S.W.3d 785, 818 (Tenn. Crim. App. 2000). As such, the judgment of acquittal standard "is, in essence, the same standard applicable on appeal when this court is called upon to determine the sufficiency of the evidence after a conviction." *Id.*; *see State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). A jury verdict of guilt removes the presumption of innocence, replaces it with a presumption of guilt, *see State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982), accredits the testimony of the witnesses for the state, and resolves all conflicts in favor of the theory of the state, *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). On appeal, the state is entitled to the strongest legitimate view of the evidence and any reasonable inferences which might be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn. 1978).

In determining the sufficiency of the convicting evidence, the appellate court does not re-weigh or re-evaluate the evidence, *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990), and does not substitute its inferences for those drawn by the trier of fact from circumstantial evidence, *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). The appellate court must review the record to determine if the evidence adduced at trial is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

A person commits first-degree murder who premeditatedly and intentionally kills another, Tenn. Code Ann. § 39-13-202(a)(1) (2003), or who kills another in the perpetration of or

attempt to perpetrate a kidnapping, *id.* § 39-13-202(a)(2) (2003). A homicide, once established, is presumed to be second-degree murder. *State v. Brown*, 836 S.W.2d 530, 543 (Tenn. 1992). The state then has the burden of proving elements which elevate the homicide to first-degree murder. *Id.*

The evidence in the present case suggests that the defendant was convicted via a theory of criminal responsibility for the act of another. Our Code authorizes such convictions: "A person is criminally responsible for an offense committed by the conduct of another if[, a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person . . . aids . . . another person to commit the offense." Tenn. Code Ann. § 39-11-402(a)(2) (2003).

(a) Premeditated Murder.

First, we examine the defendant's claim that the convicting evidence fails to establish that the defendant is guilty of the premeditated murder of the victim.

A premeditated act is "one done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-201(b)(2) (2003). "'Premeditation involves a previously formed design, or actual *intention* to kill.'" *Brown*, 836 S.W.2d at 539 (quoting *Lewis v. State*, 40 Tenn. 127, 147-48 (1859)) (italics added in *Brown*). It is the process "of thinking about a proposed killing before engaging in the homicidal conduct." *Id.* at 541. "[N]o specific period of time need elapse between the defendant's formulation of the design to kill and the execution of that plan . . . ." *Id.* at 543. Premeditation "may be shown by circumstantial evidence." *Id.* at 541; *see State v. Carter*, 970 S.W.2d 509, 516 (Tenn. Crim. App. 1997). Thus, premeditation may be inferred from the circumstances surrounding the killing. *State v. Gentry*, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). For instance, facts which might allow a jury to infer premeditation include:

> (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is planning activity;
>
> (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and
>
> (3) facts about the nature of the killing from which it may be inferred that the manner of the killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

*State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). In particular, Tennessee courts have identified some relevant circumstances:

the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing.

*State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997).

The defendant argues that the premeditated murder conviction is groundless because the defendant's pretrial statement, which was crucial in inculpating the defendant in the crimes, shows that the victim's death was unintended and that she was alive and conscious when the defendant last saw her. In our review of the evidence in the light most favorable to the state, we are not bound by the self-serving elements of the defendant's statements, and neither was the jury. In *Espitia v. State*, 199 Tenn. 696, 288 S.W.2d 731 (1956), our supreme court said, "It is for the jury to say what weight shall be given to the several parts of the [pretrial] statement, for they may well believe that part which charges the prisoner, and reject that which tends to exculpate him." *Id*. at 699, 288 S.W.2d at 733 (emphasis removed).

The majority of the panel of the court concludes that, taking the evidence presented in light most favorable to the state, sufficient evidence exists to allow a rational jury to conclude that the defendant was guilty beyond a reasonable doubt of first-degree premeditated murder. The defendant confessed that he was involved in the kidnapping and death of the victim. He admitted having detailed discussions with others concerning the plan to kidnap the victim for ransom. The plan took a week to put in motion and involved the defendant soliciting others to help carry out the kidnapping. The defendant "cased" the victim's home on at least three occasions prior to the kidnapping. The plan included obtaining hats, shirts, and six dozen donuts so as to pose as Krispy Kreme employees. A female was involved to make the entry even more plausible, while allowing the utmost of surprise to the unsuspecting victim. The defendant was involved in decisions as to where the victim would be housed. First, the victim was placed in the tire shop, then in the hotel, then the back of a U-Haul van, and ultimately, in a remote field in Mississippi. The defendant did not go into the victim's home but admitted, "I was to supervise the operation." All evidence supports that the defendant did, in fact, supervise the entire operation from seizure to death.

The medical evidence clearly established the cause of death -- suffocation. The trial court accepted the testimony of Dr. O. C. Smith as an expert in the field of Forensic Pathology. Dr. Smith testified that the cause of death was suffocation, which rendered the victim unconscious within two minutes and resulted in death within another two minutes. He opined that gray duct tape had been applied around the head and neck of the victim in such a fashion as to obstruct the victim's ability to breath, resulting in her death. Dr. Smith testified that:

I primarily looked at the head and neck region by naked eye and with glow power magnification, and photographic documentation of the wraps of tape about her

-9-

head and neck, as well as drawing diagrams depicting how the tape had been applied to that area.

The examination showed that there were multiple wraps of tape beginning at the neck surface, about where I'm pointing here, where the lower portion of the chin joins the neck, having applied in such a fashion that they were wraps of tape. The tape, two wraps of tape were underneath the neck, and then it went over the face.

At the time I examined the body the tape extended from her upper lip across the nose and then above the eyes. But with detail examination I formed the opinion that the tape had originated, originally been applied over the lower lip as well, which would have completely blocked the mouth. I made that conclusion based upon the fact that there was a blanching of the skin in a horizontal line that would be consistent with the tape being applied in a horizontal fashion across the bottom lip, closing the mouth.

And as a result of decomposition the tissues had pulled away from the tape, and the tape had slipped up. I, additionally, had that opinion reinforced by the fact that there was flattening of the tissues of the mouth in the nose up against the teeth, which meant that pressure would have to have been applied, and that pressure would have been most consistently applied by tape that had covered her mouth.

Additionally when a person decomposes fluids form in the body that are pushed out by the gases that build up, and the fluids will come out of the nose, the mouth and the other body openings. In Mrs. Webber's case the purging fluids did not exit the nose and the mouth, indicating that something had obstructed them while she was in the wet stage. That, again, reinforced my opinion that the mouth was forcibly closed by the tape at the time that she died. And as a result of the decomposition process the tape had slipped up below the upper lip.

The photographs reveal that the tape also covered the nose and eyes of the victim.

A rational jury, from the evidence present, had ample proof to conclude that the duct tape, as applied to this victim, was done so willfully, deliberately, and intentionally to cause the victim's suffocation and death. The defendant was present when the tape was applied by a co-defendant and, because of his overwhelming participation in this crime, the defendant was criminally responsible for the conduct of another.

It is the jury's prerogative to reject the defendant's explanation of how the victim's death occurred or where it occurred.

The duct tape was obtained from the tire shop. The victim was housed in the back of a U-Haul van beside the tire shop. The kidnapping for ransom plan never reached the demand for

-10-

ransom phase. Therefore, the criminal participants, including the defendant, were identifiable by the victim. The jury was free to reject any notion from this defendant that the victim was carried to a remote field in Mississippi, handcuffed behind her back and duct taped around her neck and head, for the purpose of being found and returned to her family alive. This jury had before it sufficient evidence to conclude that the kidnappers had control of a victim who could identify the criminal participants and who was expendable. The duct tape used to cover the victim's neck and head was available at the tire shop. The jury was free to reject the defendant's contention that the tape was applied in Mississippi rather than at the tire shop. The jury heard evidence that the defendant and two others rode in the front of the U-Haul van to Mississippi. Dr. Smith stated there was no evidence of a struggle where the body was located in Mississippi and described how suffocation would usually result in struggling by the victim. The remote location where the body was found and its bound condition   seems to debunk any notion that the defendant expected the victim to miraculously be found alive by some passersby.[1]

---

[1]The author of this opinion respectfully differs from the majority that sufficient evidence exists to convict the defendant of premeditated murder and conspiracy to commit premeditated murder. In the author's view, although the record reveals extensive planning for a kidnapping which certainly is a predicate for a conviction of *felony* murder, the record reveals no pre-homicide activity which suggests that the murder was *premeditated*. Other than the victim's potentially being able to identify her abductors, the evidence reveals nothing about the relationship between the victim and her abductors which suggests a motive for murder. Furthermore, there is nothing so particular and exacting about the victim's death that the offenders must have intentionally killed the victim according to a preconceived design. Obviously, placing tape around a person's mouth *and* nose may prevent breathing, depending upon the tautness of the tape, and the person's resulting death could reasonably be viewed as a knowing or reckless homicide. The evidence before us, however, in the author's view, fails to supply the circumstances of the killing, including the physical dynamics of the placement of the tape, and even in the light most favorable to the state, we would have to conjecture that the tape was affixed in a manner calculated to suffocate the victim.

Also, the author questions whether the state established "territorial jurisdiction" in connection with the premeditated murder charge and applicable lesser-included offenses. *See* Tenn. Code Ann. § 39-11-103 (2003) ("Every person, whether an inhabitant of this or any other state or country, is liable to punishment by the laws of this state, for an offense committed in this state. . . ."). Territorial jurisdiction – not to be confused with venue – "recognizes the power of a state to punish criminal conduct occurring within its borders, . . .[and it] reflects that '[a] state's criminal law is of no force and effect beyond its territorial limits.'" *State v. Legg*, 9 S.W.3d 111, 114 (Tenn. 1999) (quoting *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 658-59 (Tenn. 1990)). The defendant's statement reflects that the victim was taped in Mississippi. *See* Tenn. Code Ann. § 39-11-1-3(c) (2003) ("When the commission of an offense commenced within this state is consummated outside its boundaries, the offense is liable to punishment in this state. . . ."); *Legg*, 9 S.W.3d at 115 ("The natural and ordinary meaning of the term 'consummate' is to finish by completing what was *intended*. . . .") (emphasis added).

Accordingly, in the author's view, the conviction of premeditated murder should be reversed.

Additionally, as a matter of plain error, *see* Tenn. R. Crim. P. 52(b), the author believes that the conviction of conspiracy to commit premeditated murder is unsupported by sufficient evidence.

> The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes

(continued...)

(b) Felony Murder.

For purposes of our analysis of felony murder as that offense was alleged in the indictment in the present case, kidnapping is "false imprisonment . . . [u]nder circumstances exposing the [victim] to substantial risk of bodily injury." Tenn. Code Ann. § 39-13-303(a)(2) (2003). False imprisonment is committed by a person who "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a) (2003).

The defendant urges this court to hold that the victim's killing was not in perpetration of the kidnapping. We disagree. Indeed, a determination that an accused committed felony murder must be grounded upon a finding that the killing and the predicate felony were "closely connected in time, place, and causation, and continuity of action." *State v. Pierce*, 23 S.W.3d 289, 295 (Tenn. 2000). In the present case, however, the perpetrators were still unlawfully confining the victim, thus interfering with her liberty, when she was killed. We hold that the homicide was committed in the perpetration of kidnapping.

(c) Conspiracy to Commit Felony Murder.

Although not specifically raised as an issue by the defendant, we hold that the conviction of conspiracy to commit felony murder must be reversed and that charge dismissed. A conspiracy is committed when two or more people, "each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense." Tenn. Code Ann. § 39-12-103(a) (2003). This court has held that "conspiracy to commit felony murder . . . is not an offense in Tennessee." *State v. Anthony Perry*, No. W1999-01370-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Jackson, July 13, 2001). Based upon that holding, the defendant's conviction of conspiracy to commit felony must be reversed, and the charge must be dismissed.

III. Photographs.

[1](...continued)
such offense.

Tenn. Code Ann. § 39-12-103(a) (2003). Because the state failed to establish that the defendant premeditated the death of the victim, and because conspiracy to commit premeditated murder requires that the defendant had the culpable mental state of premeditation, the author believes the conspiracy conviction suffers from the same paucity of evidence as does the premeditated murder conviction. The conviction of conspiracy to commit premeditated murder must be reversed.

-12-

In his next issue, the defendant claims that the trial court erred by admitting photographs of the victim's body.[2] The photographs showed the victim's decomposing body both *in situ* and in the morgue. The defendant argues that the photographs, which showed decomposing tissue and the effects of insect activity on the corpse, were inflammatory and were not relevant to any sentencing issue.

Tennessee Code Annotated section 39-13-204(c) (2003) provides in pertinent part:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection (c) shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee.

Tenn. Code Ann. § 39-13-204(c) (2003). On appeal, the trial court's decision to admit a photographic exhibit is reviewable for abuse of discretion. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978).

The state sought a sentence of death based upon the statutory aggravator that the offense was "heinous, atrocious and cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." *See* Tenn. Code Ann. § 39-13-204(i)(5) (2003). Although the trial court determined that the photographs should be excluded from the guilt phase of the trial because the prejudicial effect outweighed the probative value, *see* Tenn. R. Evid. 403, it ruled that, for purposes of the penalty phase, the photographs were relevant to establish the aggravating factor. The trial judge opined that the photographs depicted the offenders' attempt to "send a message" to segments of the community. In particular, the judge believed that the positioning of the body with the genitalia exposed was suggestive of the aggravating factor.

On the record, the court's rationale for admitting the photographs is not persuasive. The notion that the victim's body was positioned to "send a message" was not *per se* established in the record, and we are not convinced that the imputed reason for the body's positioning could be

_____

[2]The trial court overruled the defendant's pretrial motion *in limine* to exclude the photographs of the victim in the penalty phase. The trial court granted the motion with respect to use of the photographs during the guilt phase.

reasonably inferred. At any rate, the positioning of the victim's corpse has no direct relationship to the applicable aggravating factor, which requires that the torture or abuse exceed that necessary *to produce death. See* Tenn. Code Ann. § 39-13-204(i)(5) (2003).[3]

Having said that and despite the potential for prejudice being a dynamic in determining that admitting the photographs was error, we hold that the error was harmless. *See* Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). We do not believe that the error affected the judgment. *See id.* During the guilt phase of the trial, the jury heard the medical examiner describe in detail the condition of the body, the jury would have been exposed to some pictures of portions of the body, and moreover, the jury eschewed the death penalty, a result that belies the defendant's claim that the photographs inflamed the jury's passions against him. We discern no indication that the photographs affected the result of the sentencing proceeding and decline to vacate the first-degree murder sentencing judgment.

IV.  Victim Impact Evidence.

We combine two issues relating to the use of victim impact evidence. In the first, the defendant claims that the trial court erred in allowing the victim's mother to testify and in approving her testimony before holding a jury-out hearing. In the second issue, the defendant claims that the statute authorizing the use of victim impact testimony is unconstitutional.

(a)  Specific Victim Impact Testimony.

The defendant claims that the trial court erred allowing the victim's mother to testify about the experience of loss resulting from the victim's death, and secondarily, he claims that the trial court erroneously made this decision without first conducting a jury-out hearing of the proffer of the proposed witness' testimony. We reject both claims.

Neither the United States Constitution nor the Tennessee Constitution prohibit the use of victim impact testimony to serve as a reminder to the jury in a capital case that "the victim is an individual whose death represents a unique loss to society and in particular to his family." *State v. Nesbit*, 978 S.W.2d 872, 889 (Tenn. 1998) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S. Ct. 2597, 2608 (1991)). Accordingly, victim impact evidence may be presented in a sentencing

---

[3]In disposing of a challenge to the applicability of the (i)(5) aggravator, the trial judge expressed his view that the two minutes or so in which the victim suffered from the pain and terror of impending suffocation supported the use of the (i)(5) factor. The challenged exhibits illustrate the method of wrapping the victim's head with tape and of cuffing the victim's hands behind her back. Initially, we agree in principle with the state's claim that the pictures were relevant to show the nature of the murder as it relates to the (i)(5) aggravator. However, we acknowledge that the photographs are extremely unpleasant and in varying degrees, gruesome in that they depict the victim's body in a state of decomposition. When considered in their totality, the prejudicial value of the six photographs outweighs their probative value. The trial court should not have admitted all six photographs. That said, however, we believe that two of the photographs, exhibits 23 and 24, which are close shots of the victim's taped head and handcuffed wrists, were properly admitted as more probative than prejudicial on the issue of the (i)(5) aggravator.

-14-

procedure when authorized by state law, *id.* at 890, and our Code section 39-13-204(c) authorizes the use of victim impact testimony in a first-degree murder jury sentencing procedure:

> The court shall permit a member or members, or a representative or representatives of the victim's family to testify at the sentencing hearing about the victim and about the impact of the murder on the family of the victim and other relevant persons. Such evidence may be considered by the jury in determining which sentence to impose. The court shall permit members or representatives of the victim's family to attend the trial, and those persons shall not be excluded because the person or persons shall testify during the sentencing proceeding as to the impact of the offense,

Tenn. Code Ann. § 39-13-204(c) (2003). "[V]ictim impact evidence," however, "which threatens to render the trial fundamentally unfair or which poses a danger of unfair prejudice is not appropriate and should be excluded by the trial judge." *Nesbit*, 978 S.W.2d at 891. Furthermore,

> To enable the trial court to adequately supervise the admission of victim impact proof, we conclude that the State must notify the trial court of its intent to produce victim impact evidence. Upon receiving notification, the trial court must hold a hearing outside the presence of the jury to determine the admissibility of the evidence. The victim impact evidence should not be admitted until the trial court determines that evidence of one or more aggravating circumstances is already present in the record.

> Generally, victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family. Of these types of proof, evidence regarding the emotional impact of the murder on the victim's family should be most closely scrutinized because it poses the greatest threat to due process and risk of undue prejudice, particularly if no proof is offered on the other types of victim impact. However, there is no bright-line test, and the admissibility of specific types of victim impact evidence must be determined on a case-by-case basis.

-15-

*Id.* (citations and footnote omitted).

In the present case, before the jury sentencing procedure began, the trial court heard arguments concerning the admissibility of victim impact evidence and, without a jury-out hearing, ruled that the state could use such evidence. A close inspection of the record, however, reveals that the court was ruling upon a question of law – whether victim impact evidence under the Tennessee statute as a means of establishing an aggravating factor is *generally* admissible. The trial judge rejected these arguments. The assistant district attorney general then requested a jury-out hearing on the *specific* testimony, which the state proposed to present via the victim's mother. The court conducted the hearing and approved the victim's mother's proposed testimony. In our view, the court proceeded in a proper fashion, and we find no fault with it.

As to the trial court's substantive ruling on the use of testimony of the mother of the victim, we hold that the testimony fit within the boundaries erected by *Nesbit*. Although the testimony articulated the emotional impact upon the victim's immediate family and such evidence must be closely scrutinized so as to avoid undue prejudice, *see Nesbit*, 978 S.W.2d at 891, and although no other type of victim impact evidence was presented, we hold that the testimony presented was narrow and within proper bounds. We discern no error in this case in allowing the state to present the victim's mother to testify as to the impact of the victim's death.

### (b) Legal Claim: Constitutionality of Code Section 39-13-204(c).

The defendant claims that the victim impact evidence statute, Code section 39-13-204(c), violates the "law of the land" clause of the Tennessee Constitution. *See* Tenn. Const. art. I, § 8. He assails the statute on bases that it is unlimited, broad, vague, and impermissibly authorizes the jury's valuation of the victim's life.

This bid to invalidate section 30-13-204(c) fails. The defendant cites to no applicable authority to support his claim, and moreover, section 39-13-204 has been held to be compliant with Tennessee Constitution article I, section 8. *State v. Shepherd*, 902 S.W.2d 895, 907 (Tenn. 1995). We are bound by the precedent of the Tennessee Supreme Court.

### V. Jury Instructions.

The defendant mounts two challenges to the trial court's jury instructions. First, he claims that the instructions were unclear and confusing. Second, he claims that the trial court delivered erroneous instructions on the definition of "knowing" as an element of second-degree murder.

### (a) Unclear, Confusing Instructions.

This issue that the instructions may have confused the jury as to the numeration of the charged counts was presented for the first time on appeal. The issue is waived, therefore, because it was not presented in the defendant's motion for new trial. *See* Tenn. R. App. P. 3(e) (in all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . jury instructions granted or refused . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise, such issues will be treated as waived).

(b)  Definition of "Knowing" and "Intentional".

The defendant next argues that the trial court erred in not limiting the definition of "knowing" and "intentional" for purposes of instructing the jury as to these respective elements of second-degree and first-degree, premeditated murder. He bases his argument upon *State v. Page*, 81 S.W.3d 781 (Tenn. 2002). In *Page*, this court held that the trial court should not instruct the jury as to the nature of conduct mode of the "knowing" element of second degree murder, a result of conduct crime. *Id.* at 789.

This claim is also waived for failure to include it in the motion for new trial. *See* Tenn. R. App. P. 3(e). Notwithstanding waiver, to the extent that the defendant mentions the trial court's inclusion of the nature of conduct definition of "knowing" for purposes of explaining the elements of second-degree murder, the issue was rendered moot by the jury's verdicts of first-degree murder. *See State v. Paul Graham Manning*, No. M2002-00547-CCA-R3-CD, slip op. at 8-9 (Tenn. Crim. App., Nashville, Feb. 14, 2003). To the extent that the defendant seeks to apply the principles of *Page* to a finding of premeditated first-degree murder, this court has held that an instruction that included the nature of conduct mode of the definition of "intentional" is harmless error. *See, id.,* slip op. at __; *State v. Hill*, 118 S.W.3d 380, 385-86 (Tenn. Crim. App. 2002).

VI.  Conclusion.

The defendant's convictions for premeditated first-degree murder and for conspiracy to commit that offense must be reversed. In all other respects, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE